IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 4, 2022

## STATE OF TENNESSEE v. JOSHUA BEADLE

**Appeal from the Criminal Court for Shelby County
No. 15-02801    Chris Craft, Judge**

_____

### No. W2022-00171-CCA-R3-CD

_____

The Defendant, Joshua Beadle, was convicted by a Shelby County Criminal Court jury of aggravated rape.  The trial court sentenced him to serve twenty-five years and to community supervision for life.  On appeal, he contends that the evidence is insufficient to support his conviction.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which J. ROSS DYER and TOM GREENHOLTZ, JJ., joined.

Joshua J. Roberts (on appeal), John Dolan (at trial), and Shaun Schielke (at trial), Memphis, Tennessee, for the Appellant, Joshua Beadle.

Jonathan Skrmetti, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Amy P. Weirich, District Attorney General; Abby Wallace and Christopher Whitten, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's conviction relates to a January 30, 2006 apartment invasion and sexual assault.  The victim did not identify the Defendant in a photograph lineup in May 2006, but in 2015, DNA evidence collected after the offense was matched with the Defendant's DNA profile in a computer database.  Thereafter, the victim was shown another photograph lineup and identified the Defendant as the perpetrator.  Fingerprints found outside the victim's bedroom window were also matched to the Defendant's fingerprints.  At the trial, the Defendant claimed that he knew the victim and had been to her apartment, that any sexual encounter had been consensual, and that the victim had "staged" evidence of a sexual assault.

At the trial, the victim testified that on January 30, 2006, she lived alone and was awakened by a loud boom, which caused her to jump from bed. She said that she went out of her bedroom into a "walkway" in her apartment and that a "black male [wearing] dark colored clothing" repeatedly demanded money from her. She was "100 percent certain" she had never met the man before this incident. She said he forced her into her bedroom and onto the bed, got on top of her, and continued to ask for money. She said she directed him to a handbag containing $5 or $10, which he took and demanded to know if she had more money. She said she begged the man not to hurt her. She said the man took her into the living room, looked out the window, put his hand between her legs, and removed her shirt. She said he took her back into the bedroom, where he demanded oral sex. She said that after she refused, he demanded she kiss and touch him "like you love me." She said the man removed his pants and her pants and penetrated her vaginally and anally with his penis. She said he kissed her back. She said that she begged him to stop and that he threatened to kill her. She said that the man began hitting her with his hands and that she tried to defend herself but was unable to "fight him off." She said that she hit the man with a hole puncher, that he choked her with his elbow, and that he demanded money. She said she told him a desk drawer contained money but that he became angrier when it did not and that he threatened to kill her. She said he beat her with her desk chair after she fell to the ground. She said that he stated he was going to get a knife and that he was going to kill her. She said that he left the room and that she fled the apartment, naked. She said she knocked on the doors of other apartments and went into another building in the apartment complex, where she lay on a doormat in a fetal position until police officers arrived.

The victim testified that she was taken to a rape crisis center, where swabs were used to collect specimens from her mouth, vagina, and anus. The victim said she was in pain from the assault, that the penetration of her vagina had felt like she was being stabbed, and that she had bruises all over her body. Photographs were received as exhibits which showed the disarray in the victim's apartment after the incident, which the victim said had not existed beforehand; the victim's broken front door; and injuries to the victim's eye, forehead, behind her ear, lip, and back.

The victim testified that a few months after the incident, a police detective showed her a photograph lineup containing six photographs. She agreed that she did not identify a suspect from the lineup. Other evidence showed that the Defendant's photograph was in the lineup. The victim agreed that she was contacted by a police detective in 2015 and that she identified the perpetrator's photograph in a photograph lineup. She said she looked at the photographs "for a long time" and that she recognized the perpetrator's eyes. She identified the Defendant in the courtroom as the man who raped her. The victim testified that on the day of the attack, she was wearing contact lenses, in which she had slept. She did not recall if she had been shown more than one set of photographs when she was shown the photograph lineups.

Ryan Kendall, who was the victim's former neighbor, testified that on January 30, 2006, he heard a "loud boom sound" around the time his alarm clock sounded. He said he tried to look outside through his door's peephole but could not see anything and that he looked out a kitchen window but did not see anyone or any broken windows. He said that as he got ready for work, he heard another sound. He said that when he opened his door to leave for work, he saw the victim's front door "busted in" and her apartment "trashed" and that he called the police. He said he later discovered tape had been placed over his door's peephole. A photograph of the peephole covered with tape was received as an exhibit.

Memphis Police Lieutenant Robert Herring testified that he responded to the victim's apartment complex. He said he found the crying, upset, and naked victim crouched down outside an apartment. He said that the weather was cold and that he "knew that wasn't right." He said the victim had acted afraid when she heard his voice.

Memphis Police Officer Newton Morgan testified that on January 30, 2006, he photographed the scene at the victim's apartment and collected evidence, including fingerprint evidence he found on the outside of the bedroom window, bed linens, and clothing. He did not recall if he had seen a desk chair or a knife at the scene.

Memphis Police Department employee Robert Davis, an expert in latent print examination, testified that he compared the fingerprint evidence collected from the outside of the victim's bedroom with the Defendant's known fingerprint samples and concluded that the fingerprints at the scene belonged to the Defendant.

Rape Crisis Center employee Kristine Gable, a nurse practitioner and expert sexual assault examiner, testified that she had reviewed the report prepared by nurse Rochelle Copeland, who examined the victim on January 30, 2006. The report was received as an exhibit. Referring to the report, Ms. Gable recounted the account of the sexual assault the victim had given to Ms. Copeland, which was consistent with the victim's trial testimony. Referring to the photographs of the victim's injuries previously received as exhibits, Ms. Gable said the victim had a laceration and a bruise behind her ear, forehead swelling, and a laceration of the inner lower lip, all of which were indicative of blunt force trauma. Ms. Gable noted the victim also had an injury to the frontal bone above the left eye and scratches on the right eyelid.

Retired Memphis Police Lieutenant Darlene Smith testified that she took the victim's statement on January 30, 2006. She said that in May 2006, she "bec[a]me aware of" the Defendant due to similarities in the victim's case and other incidents. She said her investigation did not reveal any connection between the victim and the Defendant. Ms. Smith said that she showed the victim a photograph lineup containing the Defendant's

photograph but that the victim did not make an identification. Ms. Smith said that analysis conducted in 2006 of the fingerprint evidence and the evidence collected at the rape crisis center did not identify a suspect.

Memphis Police Detective Valerie Blackman, a Cold Case Unit officer, testified that a DNA match to the Defendant was obtained in the victim's case in April 2015. Detective Blackman said she interviewed the victim and showed the victim a photograph lineup, from which the victim identified the Defendant as the person who had raped her. Detective Blackman said she collected a DNA sample from the Defendant, which she submitted for testing.

Tennessee Bureau of Investigation (TBI) Special Agent Forensic Scientist Supervisor Lawrence James, an expert in serology and DNA analysis, testified that he examined evidence collected from the victim. He said the swabs used to collect evidence from the victim's vagina and anus both tested positive for a protein found in semen but that he did not observe semen upon microscopic analysis of the evidence. He explained that semen might be present in ejaculate, even in the absence of sperm. He said that swabs used to collect evidence from the victim's back tested positive for an enzyme found in saliva.

Agent James testified that DNA analysis of the vaginal and anal swabs showed they contained a mixture of DNA material, with one DNA profile being consistent with the victim's profile and with the other profile being that of an unknown male. Agent James said the back swabs contained a mixture of DNA, with the major contributor being an unknown male with the same DNA profile as the unknown male from the vaginal swabs. He said the DNA profile of the minor contributor to the back swabs was consistent with the victim's profile. He said he uploaded the DNA profile of the unknown male obtained from the back swabs to the CODIS database, which he said contained DNA profiles of "probable, possible offenders." Agent James said that in 2015, he was notified that CODIS had matched the Defendant's profile to the profile he had uploaded. He said that he later analyzed a DNA sample collected from the Defendant and compared them to the vaginal and back swabs previously collected from the victim. He said the Defendant's DNA profile was consistent with the male DNA profile from the vaginal swabs and that the likelihood of another person having the same profile was one in 42,350 in the African-American population, one in 176,600 in the Caucasian population, one in 292,800 in the Southwestern Hispanic population. Agent James said the Defendant's DNA profile was consistent with the male DNA profile from the back swabs and that the likelihood of another person having the same profile was one in a number which exceeded the world population.

At the close of the State's proof, the State elected the act of vaginal penetration causing bodily injury as the mode of committing aggravated rape.

The Defendant testified that before January 30, 2006, he had "met" the victim at a downtown bar "[a] few times." He said he had also been to her apartment "a few times." He said he had not raped the victim, kicked in her door, or demanded money from her on January 30. He did not deny having contact with her on January 30 and said that if he had been at her apartment on that day, it had been by her invitation and with her permission. He said that he and the victim had exchanged text messages and telephone calls in Winter 2006 but that he did not know the specific dates.

The Defendant testified that he never looked into the victim's bedroom window on January 30, 2006. When asked why his fingerprints were outside her bedroom window on January 30, he said that on a date he did not recall, the victim had had a burglar inside her apartment and that he "checked the apartment" after she called him. The Defendant said he had a consensual sexual encounter with the victim before her door was broken by an intruder. The Defendant said that the victim had "staged" the occurrence of a brutal rape and that if an officer found the naked victim outside, "it was staged." He said he did not know if it were true that the officer found the naked victim outside because he had not been present. When asked if the victim was "lying" about the Defendant's having raped her, he said, "Yes[.]" The Defendant acknowledged that he had two prior burglary convictions.

After receiving the evidence, the jury found the Defendant guilty of aggravated rape. At a sentencing hearing, the trial court imposed a twenty-five-year sentence and community supervision for life. This appeal followed.

The Defendant contends that the evidence is insufficient to support his aggravated rape conviction. He argues that the victim's testimony was insufficient to support a finding of guilt and that the other evidence "did not entirely negate the narrative [he told] during the trial." The State counters that the evidence sufficiently supports the conviction. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v.*

*Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Circumstantial evidence alone may be sufficient to establish the perpetrator's identity. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The identity of the perpetrator is a question of fact for the jury to determine. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt[.]'" *Rice*, 184 S.W.3d at 662 (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

As relevant here, "[a]ggravated rape is unlawful sexual penetration of a victim by the defendant" in which "[t]he defendant causes bodily injury to the victim[.]" T.C.A. § 39-13-502(a)(2) (2018) (subsequently amended). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" *Id.* § 39-13-501(7) (2018). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" *Id.* § 39-11-106(2) (2006) (subsequently amended).

Viewed in the light most favorable to the State, the record reflects that a man forcibly entered the victim's apartment by kicking in the door. He demanded money, penetrated her vagina with his penis without her consent, threatened to kill her, hit her, choked her, and beat her with a chair. The victim suffered vaginal pain which felt like she had been "stabbed" during the rape and had lacerations, bruising, swelling, and scratches from the assault. The victim identified the Defendant in a photograph lineup, and she testified that she had not met the Defendant before the date of the offense. The Defendant's fingerprints were found outside the victim's bedroom window, and a DNA profile consistent with the Defendant's DNA profile was identified from samples collected from the victim's vagina and back. The vaginal and anal samples contained a protein found in semen, and the swab collected from the victim's back contained an enzyme found in saliva. The jury heard the Defendant's account of having known the victim, having had consensual sexual intercourse with her, and having "checked" her apartment after it was burglarized. The jury rejected the Defendant's testimony in favor of the State's proof demonstrating his identity as the perpetrator of an aggravated rape. We may not invade the province of the jury as the trier of fact. *See Bland*, 958 S.W.2d at 659 (Tenn. 1997).

We have taken into account the Defendant's argument that the victim's testimony was not corroborated. Aside from the fact that this is factually inaccurate based upon the record before us, "[t]here is no requirement that a rape victim's testimony be corroborated." *State v. Willis*, 735 S.W.2d 818, 820 (Tenn. Crim. App. 1987). The evidence is sufficient to support the Defendant's conviction of aggravated rape. He is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE